470 P.2d 689

**ASSOCIATES FINANCE CORPORATION,**
an Arizona corporation, Appellant,

v.

**James C. WALTERS and Liberty Trailer Sales, Inc., an Arizona corporation, Appellees.**

**No. 1 CA-CIV 962.**

Court of Appeals of Arizona,
Division 1,
Department B.

June 17, 1970.

Rehearing Denied Aug. 5, 1970.
Review Denied Oct. 20, 1970.

**370**

McKesson, Renaud, Cook, Miller & Cordova, by Joseph B. Miller, Phoenix, for appellant.

Pain & Julian, by Fred J. Pain, Jr., and Moore, Romley, Kaplan, Robbins & Green, by Kenneth J. Sherk, Phoenix, for appellees.

JACOBSON, Judge.

This appeal concerns the accuracy of an accounting between a retail mobile home dealer and its financing company dealing with reserves withheld by the financing company on retail conditional sales contracts purchased by it.

Plaintiffs, JAMES C. WALTERS and LIBERTY TRAILER SALES, INC., an Arizona corporation, brought an action in two counts against defendant, ASSOCIATE FINANCE CORPORATION, an Arizona corporation, seeking in Count One, a return of certain debentures held by

defendant and belonging to the mother of JAMES C. WALTERS, and in Count Two, an accounting of certain monies allegedly due plaintiffs as part of the purchase price of conditional sales contracts purchased by defendant from plaintiffs, arising out of plaintiff LIBERTY TRAILER SALES' retail mobile home sales business. The trial court dismissed Count One of the plaintiffs' complaint and no appeal has been taken from this dismissal. The jury returned a verdict in favor of the plaintiffs on the accounting in the sum of $85,062.06. From the judgment entered thereon and the denial of defendant's post-trial motions this appeal was taken.

In this opinion, JAMES C. WALTERS shall be designated as "Walters", plaintiff LIBERTY TRAILER SALES shall be designated as "Liberty", and defendant ASSOCIATES FINANCE CORPORATION shall be designated as "Associates."

The trial of this complicated matter, before a jury, extended over one week of trial, and over 400 separate exhibits were introduced outlining the numerous transactions between plaintiffs and defendant. Basically, however, there appears to be little factual dispute between the parties, the question being primarily the legal consequences flowing from these facts.

In 1957, Walters and one Greer formed Liberty for the purpose of engaging in the business of retail sales of mobile homes. At the time of formation and in the period immediately subsequent thereto, Liberty obtained financing from a company known as Pacific Finance Company. Liberty's "financing" was of two types: (1) Wholesale "floor planning" of mobile homes, and (2) secured accounts receivable financing, that is, the sale to the finance of retail conditional sales contracts on mobile homes sold by Liberty. The accounting between Liberty and Associates involved in this action deals with transactions arising out of the latter type of financing.

In the early part of 1959, Walter was approached by representatives of Associates, which had recently opened operations in the Phoenix area, to obtain Liberty's financing business. Associates proposed to provide the same type of financing to Liberty previously supplied by Pacific Finance Company but upon more advantageous terms. Insofar as pertinent here, these more advantageous terms dealt with the handling of reserves generated by the purchase of these conditional sales contracts. The term "reserves", as used in its broad sense, refers to amounts of money withheld by the financing company from monies due the dealer upon a purchase of the dealer's conditional sales contracts. These reserves are withheld by the financing company to secure the possible future liability from the dealer to the financing company which might develop in the event the retail purchaser later defaults in payment to the finance company or prepays the conditional sales contract.

In March of 1959, Liberty and Associates entered into an *oral* agreement whereby Associates took over both the wholesale financing and retail financing of Liberty's mobile home business. Insofar as pertinent here, the terms of this agreement were primarily as follows:

(1) That Associates would withhold reserves as security for Liberty's contingent liability under its repurchase agreement concerning repossessions.

(2) That monies in the reserve account were Liberty's earned money.

(3) That Associates would not make any charges to Liberty's reserve accounts without Liberty's permission.

(4) That the amount due on repossessions would be reduced by applying interest pro rata.

(5) That Associates would not charge reserve accounts for the amount of unearned precomputed interest when a retail purchaser prepaid his conditional sales contract.

(6) That Liberty was entitled to a release of any funds in the reserve accounts in excess of 5% of the total outstanding indebtedness rep-

resented by conditional sales contracts financed by Associates.

Pursuant to this agreement, initially two reserve accounts were set up by Associates. The first was referred to as a "Hold Reserve." To this account an amount would be credited in Liberty's name equal to the difference between the discount interest rate charged by Associates to Liberty and the interest rate charged by Liberty to its retail customers. The discount interest rate charged by Associates to Liberty fluctuated, depending on whether the mobile home unit was new, used and if used, its age. The second reserve account was referred to as a "Credit Reserve." To this account, an amount would be credited in Liberty's name equal to 5% of the unpaid balance of the sales price of the particular mobile home unit reflected in the particular conditional sales contract.

In October of 1959, a third reserve account was established called a "Dealer Certificate Account." To this account was credited in Liberty's name the amount that the unpaid purchase price, as reflected in the conditional sales contract, exceeded the "Blue Book" value of the unit.

As previously indicated these reserves were to secure the payment to Associates of any contingent liability Liberty might have to Associates under its repurchase agreement in the event of a default by a retail purchaser and a subsequent repossession of a mobile home. The language of the repurchase agreement which gave rise to this contingent liability provided that, "[Liberty] hereby agrees with [Associates] that in the event of repossession [it] will purchase that vehicle from [Associates] at the place of repossession at the then *unpaid balance due under the contract* * * *" This language was contained in each of the over 400 conditional sales contracts purchased from Associates by Liberty during the period of time Liberty was in operation.

In October, 1962, Liberty ceased operations as a retail mobile home dealer. Following the cessation of business by Liberty, Walters, who at that time was prime stockholder of Liberty, formed a new mobile home dealership with one Spence, under the name of Liberty Enterprise Trailer Sales, hereinafter referred to as "Liberty Enterprise." Some of the assets of Liberty were transferred to Liberty Enterprise.

Prior to Liberty's cessation of business, when defaults were made under conditional sales contracts purchased by Associates and repossession of the unit was required, Liberty was called by phone, advised that repossession was necessary and advised to pick up the unit involved which was then stored on Liberty's lot during the time foreclosure of the retail purchaser's interest in the unit took place. Following the forfeiture of the purchaser's interest, the unit was then either floor planned again by Associates under its wholesale financing arrangements or Liberty paid Associates the balance due on the repossessed unit.

After October, 1962, the same procedure was followed by calling Walters at Liberty Enterprise and the unit was then handled by the latter entity. Liberty Enterprise had signed a continuing guarantee of Liberty's contingent liability with Associates. Walters subsequently terminated his association with Liberty Enterprise. Following this termination repossessions were generally handled by other dealers.

Unfortunately, the evidence does not exactly disclose how each of the more than 100 repossessions were handled. That is, whether Walters, Liberty, Liberty Enterprise or some other dealer or purchaser at the foreclosure sale obtained possession of the particular unit involved. However, the evidence is clear that on each and every repossession, Associates charged Liberty the total amount of moneys placed in the various reserve accounts for the conditional sales contract relating to the repossessed unit. Thus, when a repossession occurred, Associates, in arriving at the "unpaid balance due" from Liberty pursuant to its repurchase agreement (this "unpaid balance due" being the basis of Liberty's liability to Associates under that

repurchase agreement) would take the total contract price as called for by the conditional sales contract, reduce this amount by (1) the amount of payments made by the conditional buyer, (2) the amount of prorated interest unearned, and (3) the amount of reserves withheld under that contract, with the balance after the subtraction of items representing Liberty's liability.

In addition to charging Liberty's reserve accounts on repossessions, Associates also charged these accounts when a conditional sales contract was prepaid by the conditional buyer in an amount equal to Liberty's proportionate share of unearned interest deducted from the conditional buyer's contract by reason of the prepayment.

Liberty argues that the evidence shows that $229,698.61 had been credited to Liberty's reserve accounts.[1]

Associates claim deductions under charges for prepayment of conditional sales contracts and repossessions in the sum of $235,444.46 and counterclaimed against Liberty and Walters, under his personal guarantee, for the difference between these amounts (a deficit balance in Associates favor in the sum of $5,745.85). As previously indicated the jury returned a verdict in Liberty's favor in the sum of $85,062.06. It is apparent that this amount was determined by deducting from $229,-698.61 (the entire total credited to the reserve account) the following items: (1) $143,118.00 which represented the total checks actually paid to Liberty by Associates under the 5% excess release provision plus (2) an item of $1,518.55 which Liberty conceded was a proper charge on a repossession, or a total admitted, properly deducted, sum of $144,636.55. In other words the jury verdict failed to consider deductions made by Associates for any charges by reason of prepayment of the conditional sales contract or any charges against the reserve account that Liberty incurred by reason of its repurchase agreement.

Associates raised primarily the following issues on appeal:

(1) Did the trial court err in permitting Liberty's attorney to participate in the litigation over Associates' objection?

(2) Does the evidence support the jury's verdict and the judgment rendered thereon?

Liberty raises in its briefs on appeal the alleged failure of a judgment to comply with Rule 54(b), Rules of Civil Procedure, 16 A.R.S. (Supp. 1969–70). This rule was previously raised in this court by a motion to dismiss which was denied. We do not feel that a reconsideration of this court's position on this point is necessary.

In regard to the first issue raised by Associates, it appears that Mr. Fred Pain, Liberty's attorney, was formerly employed by the law firm of McKesson, Renaud, Cook, Miller & Cordova, Associates' attorneys. During the period of time Mr. Pain was employed by Associates' attorneys he performed various legal services for Associates, including some collection work. There is no evidence he performed any work for Associates in connection with Walters, Liberty or Liberty Enterprises.

The complaint in this case was filed on June 2, 1966, wherein Mr. Pain appeared as attorney for Liberty. Subsequent to filing the complaint and answer, extensive pretrial discovery was engaged in, including on January 18, 1967, Associates supplying to Mr. Pain all of its records concerning all transactions between Liberty and Associates.

Almost one and one-half years after this litigation was commenced, a motion was filed by Associates seeking to disqualify Mr. Pain by reason of his prior employment by Associates' law firm. The trial court, on hearing this motion, determined that Mr. Pain's prior employment did not disqualify him from representing Liberty in this litigation. The propriety of the action of the trial court in deny-

---

1. While this amount was argued to the jury and its verdict was based thereon, a compilation from exhibits in evidence shows the sum of $229,514.09 was credited to all of Liberty's reserve accounts.

ing Associates' motion was presented by way of an extraordinary writ to the Supreme Court which denied Associates' petition without written opinion on January 23, 1968.

Following the trial in this matter a motion to be relieved from the judgment was filed by Associates alleging that new evidence had been found which indicated that while Mr. Pain had been employed by Associates' attorneys he came into possession of information that Associates in many instances made oral agreements with dealers concerning reserve accounts. After a hearing was held by the trial court on this motion, it denied Associates' motion.

■ As a general rule, an attorney can and should be disqualified from representing interests adverse to a former client when the former client objects, if the attorney has given advice to the former client which is in opposition to that now taken by the attorney, if the attorney has obtained information from the prior representation which would be adverse to the former client's interest or helpful to the present client, or if the present litigation is substantially related to matters of past representation. Rule 29(a), Rules of the Supreme Court, 17 A.R.S. (1956); Canons 6 and 37, Canons of Professional Ethics of the American Bar Association; Canon 4, Code of Professional Responsibility of the American Bar Association; A.R.S. § 32–263(5) (1956). Associates claim all of these elements are present in the case of Mr. Pain's representation of Liberty against Associates. We have carefully reviewed the evidence presented to the trial court on this issue and cannot say, as a matter of law, the evidence sustains Associates' position. The trial court heard the witnesses and observed the conduct of the trial and concluded that the actions of Mr. Pain were not prejudicial to Associates. In view of the type of action involved here, we cannot say that such prejudice by reason of past representation can be assumed. It should be kept in mind that we are here passing on the prejudicial effect of the prior representation on the present litigation in determining whether reversal of the matter should be granted, and not on whether proper ethical standards were observed. We do not intend to be understood as commenting in any manner on this latter question.

■ Turning to the sufficiency of the evidence to support the verdict question the legal principles involved are rather simple. The burden of showing that an accounting is necessary is on the party requesting the accounting. However, after the necessity of an accounting has been shown the burden shifts to the party holding the funds to prove by competent evidence the validity of each charge made on these funds. Mollohan v. Christy, 80 Ariz. 141, 294 P.2d 375 (1956); Fernandez v. Garza, 88 Ariz. 214, 354 P.2d 260 (1960).

■ We have previously set forth in this opinion the oral agreement between the parties as to how reserves were to be set up and handled by Associates. One of the provisions of this agreement was that Associates would not charge accounts with precomputed unearned interest reserves on prepayment of conditional sales contracts. This Associates did and therefore the jury was justified in finding that Associates failed to sustain its burden of proof as to the validity of these charges dealing with prepayment. Our review of the exhibits in evidence discloses that Associates charged Liberty $11,108.70 on prepaid conditional sales contracts. Accounting sheets admitted into evidence disclose that only $8,509.18 was charged to prepaid debits. However, a compilation of the answers to interrogatories in evidence reveals that $11,108.70 was charged in prepaid contracts. In order to give the greatest weight to the jury's verdict, we hold that that verdict can be sustained as to the latter amount.

■ The oral agreement between the parties is clear that the sole purpose of setting up reserves was to secure Associates for any contingent liability which might become due to it from Liberty under

Liberty's repurchase agreement on repossessions. The evidence is also clear that in the case of repossessions, the reserves were applied in such a manner as to reduce Liberty's liability under its various repurchase agreements. Liberty contends that under its oral agreement this could not be done without its prior permission. Assuming that Associates breached its agreement with Liberty by applying these reserves without permission, we are unable to see in what manner Liberty was damaged by this breach. It is evident from the agreements between the parties that Liberty had a legal obligation to give permission for the application of these reserves had permission been requested. Liberty's liability under its repurchase agreement was based upon a repossession. The reserves were specifically established to secure the liability of Liberty in the case of repossession. Under these facts we are of the opinion that Associates, under its agreement with Liberty, sustained as a matter of law the burden of proving the propriety of these repossession charges.

■ Liberty argues, however, that the failure to request permission to apply reserves in the case of repossession may have resulted, when Liberty was not the purchaser at foreclosure sale, in allowing some other person to have the benefits of its reserves by reducing the selling price of the unit. This argument might have some validity if the evidence had shown that a particular unit involved at the time of foreclosure sale would have brought a higher price than the "unpaid balance due" as reduced by the reserves. In such a case damage may have resulted to Liberty by depressing the selling price. However, the exhibits indicate that on those occasions when third parties obtained possession of a unit at foreclosure sale, the bid price was always less than the reduced by reserves "unpaid balance due." In other words, a resale at foreclosure always resulted in a deficiency owed by Liberty, regardless of the then "unpaid balance due." Therefore it appears that the reduced figure at foreclosure sale did not depress the selling price and that Liberty suffered no damages therefrom.

■ The evidence is clear and convincing that Liberty received the benefits of its reserves by reducing the amount of its liability under its repurchase agreements. The jury's verdict failed to incorporate this benefit flowing to Liberty. While normally a determination as to what figure this benefit might be would properly be for the trial court on a remand and new trial, both parties presented evidence as to what figures comprised the accounting before the trial court. In such a case it becomes merely a clerical function to ascertain this figure, which is set forth below.

Giving the jury's verdict the greatest possible weight, a correct accounting of the charges made to reserves in this matter can be summarized as follows:

| | |
|---|---:|
| Total debits claimed by Associates | $235,444.46 |
| Less admitted proper debits | 144,636.55 |
| | 90,807.91 |
| Less improper prepaid debits | 11,108.70 |
| Total debits held proper | $ 79,699.21 |

RECAP

| | | |
|---|---:|---:|
| Total credits | | $229,514.09 |
| Less: | | |
| Admitted debits | $144,636.55 | |
| Proper debits | 79,699.21 | |
| Total debits | | 224.335.76 |
| Amount due Liberty | | $ 5,178.33 |

Associates raised other issues in this matter which in view of our determination need not be passed upon.

The judgment of the trial court is reversed and the matter remanded with directions to enter judgment in favor of Liberty Trailer Sales in the sum of $5,178.33.

EUBANK, P. J., and HAIRE, J., concur.